Mary Wernick and Clara Schonholz, Appellees, v. The Western Union Telegraph Company, Appellant.

Gen. No. 39,140.

Opinion filed June 8, 1937.

WEST & ECKHART, of Chicago, and FRANCIS R. STARK, of New York, for appellant; ROY O. WEST, P. B. ECKHART, PAUL HASSELL and OWEN A. WEST, all of Chicago, of counsel.

CAIROLI GIGLIOTTI, of Chicago, for appellees.

MR. JUSTICE FRIEND delivered the opinion of the court.

Plaintiffs brought an action in the circuit court against Western Union Telegraph Company for damages resulting from the nonreceipt of $200 forwarded by Mary Wernick, in Chicago, to Clara Schonholz, in New York, by means of a Western Union money order. The court entered judgment against defendant for $500 and this appeal followed.

The amended complaint alleges in substance that May 10, 1935, Mary Wernick delivered to defendant at Chicago the sum of $200 in cash, to be transmitted by wire to the other plaintiff, Clara Schonholz, in New York City. Due to an error defendant delivered but $20 to Mrs. Schonholz, paying the difference of $180 approximately 60 days later. The $200 transmitted was intended to be used by Mrs. Schonholz in New York to pay for an operation upon her invalid son by Dr. Lorenz, of Vienna, Austria, and it is alleged that because of the nonreceipt of the money Mrs. Schonholz made a bus trip to Chicago in an endeavor to raise additional funds. In so doing she claims to have aggravated a case of diabetes and suffered mental anguish, greatly affecting her health. It is also alleged that the money not having been received in time, Dr. Lorenz returned to Europe and the operation was performed by his assistant with indifferent success. Because of these circumstances plaintiffs ask damages of $2,500.

No evidence was adduced at the hearing and judgment was entered upon the court's interpretation of the following provision, printed on the reverse side of the money order application:

"In any event, the company shall not be liable for damages for delay, nonpayment or underpayment of this money order, whether by reason of negligence on the part of its agents or servants or otherwise, beyond the sum of five hundred dollars, *at which amount the right to have this money order promptly and correctly transmitted and promptly and fully paid is hereby valued,* unless a greater value is stated in writing on the face of this application and an additional sum paid or agreed to be paid based on such value equal to one-tenth of one per cent thereof."

The sole question presented is whether the court erred in interpreting that part of the foregoing provi-

sion which we have italicized as a liquidated damage clause, under which the court held that plaintiffs were entitled to $500, upon the failure of the company to transmit the full amount, regardless of any actual damage shown by plaintiffs. It is urged by the telegraph company that this provision was never intended as a liquidated damage clause, but only as a maximum liability provision for rate making purposes.

This transaction was interstate in character. Prior to 1910 the legal relations of telegraph companies with their patrons were controlled by the common law prevailing in the several States. Through the enactment of federal legislation in 1910 the rights, duties and obligations of telegraph companies became subject to the regulations of the Federal Communications Commission, which, through rules, classifications and tariffs published and filed with the commission, fixed the liability of the carrier and did away with what had previously been a matter of common law liability. The change in the relationship of the parties thus created is clearly expressed by the United States Supreme Court in *Western Union Telegraph Co. v. Esteve Bros. & Co.,* 256 U. S. 566, as follows (at pp. 571, 572):

"The Act of 1910 introduced a new principle into the legal relations of the telegraph companies with their patrons which dominated and modified the principles previously governing them. Before the act the companies had a common-law liability from which they might or might not extricate themselves, according to views of policy prevailing in the several States. Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not, as before, a matter

of contract, by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial, because, when the rate is used, dissent is without effect." What was said in the *Esteve Bros.* case was later approved and affirmed in *Western Union Telegraph Co. v. Priester,* 276 U. S. 252.

The trial court in its judgment order recognized that the provision in question was one of the rate provisions of the telegraph company, but was of the opinion that the clause, "at which amount ($500) the right to have this money order promptly and correctly transmitted and promptly and fully paid is hereby valued," was in effect a liquidated damage clause entitling the sender to the full amount of $500 in any event upon the failure of the company to transmit the full amount promptly.

It is apparent that the telegraph company prepared its new rules and tariffs many years ago in accordance with an order of the Interstate Commerce Commission in the case of *Cultra v. Western Union Telegraph Co.,* 61 I. C. C. 541, where, pursuant to an investigation, it was held that the existing rules and rates of the telegraph company limiting its liability for negligence were unreasonable, and new rules and rates were prescribed and discussed by the commission, as follows:

"Upon consideration of the record we find that the present rules of the respondents restricting their liability for negligence in the transmission or delivery, or for nondelivery, of unrepeated and repeated interstate messages are and for the future will be unreasonable; that the maximum liability in the case of a message for the transmission of which the unrepeated rate is charged should be not less than $500, and for a message received for transmission at the repeated rate, $5,000, which limitations we find to be reasonable as parts of the respective rates. Provision should be

made for the transmission of valued messages under a liability *limited to* the value stated in writing by the sender of the message at the time it is offered for transmission upon payment of the repeated rate plus one-tenth of 1 per cent of the stated value in excess of $5,000. An order in accordance with the foregoing findings will be entered.'' (Italics ours.)

The provision in controversy, which at first related to messages, was subsequently extended by the telegraph company to money orders, and it is argued that it was intended to and did comply with the order of the Interstate Commerce Commission and was made in accordance with its requirements as stated in the *Cultra* case, fixing the maximum liability for unrepeated messages at $500.

Without the clause which the court interpreted as a liquidated damage proviso, the agreement is perfectly clear, and we do not perceive the reason which prompted the telegraph company to insert the clause and thus obscure the otherwise perfectly plain intendment of the agreement. Defendant's counsel cite numerous cases dealing with provisions prescribing a maximum penalty and fixing valuations for rate making purposes, but in none of them do we find clauses of a similar character. Although this particular clause has been a part of the rules, regulations, classifications and tariffs of the telegraph company since 1921, it has never been interpreted as a liquidated damage provision, and no cases are cited which would justify such an interpretation. Reading the agreement as a whole, as it must be read under the fundamental rules of construction, and taking into consideration the historical reasons for changing the legal relationship between telegraph companies and their patrons through federal legislation, and the effect thereof as stated by the court in *Western Union Telegraph Co. v. Esteve Bros. & Co.* and the *Priester* case, *supra,* we think

the court was unwarranted in interpreting the language employed as a liquidated damage clause. In so doing, it evidently failed to consider the intent, purpose and meaning of the entire clause, and considered only the words "at which amount the right . . . is hereby valued." The fair interpretation of the provision as a whole must necessarily give effect to the plainly expressed clauses which precede and follow the so-called liquidated damage provision, stating that *"in any event, the company shall not be liable for damages* for delay, nonpayment or underpayment of this money order, whether by reason of negligence on the part of its agents, servants, or otherwise, *beyond the sum of $500* . . ., unless a greater value is stated in writing on the face of this application and an additional sum paid or agreed to be paid, based on such value, equal to one-tenth of 1 per cent thereof." The provision, when read in its entirety, was clearly intended to fix, not a definite liability, but a maximum liability or agreed valuation upon which the rate to be paid for the shipment or carriage is to be collected.

It would be useless to discuss the numerous cases cited by defendant involving interstate carriers of various kinds, all of which arose under provisions in some way limiting the liability of the carrier upon an agreed valuation under a rate to be paid for the shipment or carriage, because none of them deals with the precise question here under consideration. We are satisfied, however, that the agreement in question was merely a maximum liability provision for rate making purposes, and in fact plaintiffs evidently so considered it, because in their amended complaint, which is quite voluminous, they allege in detail the facts upon which their claim for damages is predicated, and undoubtedly anticipated that they would be required to adduce proof to sustain their claim. To adopt the trial court's interpretation of the agreement would

subject the telegraph company to damages of $500 in every instance in which it failed to perform promptly or correctly, or to pay promptly or fully, even though no damage, legal or otherwise, resulted. It is conceivable, under such an interpretation, that a person transmitting $5 could recover $500 upon the failure of the company to pay the full amount, even though no damages whatsoever resulted from the nonreceipt of the money sent.

The factual issues made up by the pleadings were not tried by the court. If plaintiffs can prove that they were damaged they are entitled to an opportunity to do so. The cause should proceed to trial upon the issues made up by the pleadings. Accordingly, the judgment of the circuit court is reversed and the cause remanded for retrial in accordance with the views herein expressed.

*Judgment reversed and cause remanded.*

JOHN J. SULLIVAN, P. J., concurs.

SCANLAN, J., specially concurs.

MR. JUSTICE SCANLAN specially concurring: Notwithstanding the language of the clause in question, I am inclined to the opinion that the trial court gave a wrong interpretation to the provision in question, an interpretation which, if enforced, would in most cases place an unconscionable burden upon defendant. It seems clear that defendant did not intend, by the provision, to assume such a burden, and it seems reasonably clear that the users of defendant's service have not interpreted the provision to mean what the trial court held it does. Indeed, in the instant case, the complaint is drafted upon the theory that complainants could recover only actual damages sustained by them.